**Federal Defenders**
OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

September 13, 2019

**By ECF**

The Honorable Nicholas G. Garaufis
Senior United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:   *United States v. Michael Brogan*, 19 CR 207 (NGG)

Dear Judge Garaufis,

    Michael Brogan is a fifty-three year old native of Brooklyn. He has lived in the same house with his family since he was born. Presently, he lives with his mother and older brother. His mother was diagnosed with dementia six years ago and his brother, who was born with severe autism and intellectual disability, has never been able to live independently. Both Mr. Brogan's mother and brother require near constant supervision and each has a home health aide to assist during a portion of the day— Mr. Brogan's mother has an aide for twelve hours a day and his brother has one for six hours. The aides both work during the daytime, so Mr. Brogan is solely responsible for the care and supervision of his mother and brother for twelve hours every evening and night.

    Mr. Brogan's father passed away more than twenty years ago. Since his father's passing, Mr. Brogan has been the primary financial support for the family. While his mother and brother each receive Social Security benefits, the payments are insufficient to meet household expenses, which include monthly payments on a reverse mortgage. Mr. Brogan has worked as an IT professional since 2000. He is now employed in the IT department at New York Presbyterian Hospital in Manhattan, where he earns

about $43,000 in gross annual income. He was hired by New York Presbyterian in March, after working at the hospital through a temporary employment agency.

Mr. Brogan's difficult family situation is relevant to the Court's sentencing decision in two ways. First, Mr. Brogan's unique position as the main financial supporter and caretaker of two family members unable to live independently warrants a downward departure under USSG §5H1.6. Second, the stress imposed on Mr. Brogan by his family responsibilities contributed to the offense conduct.

Of course, Mr. Brogan's family circumstances do not excuse his criminal conduct. Public figures, like all people, deserve to live lives free from threats. Nobody should have her peace of mind shattered by a threatening communication, even an idle one. Mr. Brogan recognizes this and is profoundly ashamed of his conduct. Not only does he regret the harm posed to the victim by his words, he regrets that his conduct violated his own deeply held religious beliefs. Of course, Mr. Brogan had no intention of carrying out any threat; he has never owned or possessed a firearm.

In the days and weeks following his arrest, it was difficult for Mr. Brogan to explain his conduct. As his therapist reported at the time, Mr. Brogan had "little insight into [the] instant offense." (PSR ¶ 39). When Mr. Brogan voluntarily discussed the matter with the arresting agents, he explained that he had watched a video of the victim discussing reproductive rights and became "very angry" and this led him to make the threatening call. (PSR ¶ 4). This threat, however, was a singular occurrence. He has not made other threats in the past or since. To this day, he is shocked by his actions and has been attending counseling sessions, for the first time in his life, to address his stress and anxiety and also to learn coping strategies.

Mr. Brogan is scheduled to be sentenced on September 27, 2019 for threatening a United States official. As noted below, the correct final offense level in this case is 12, which corresponds to a recommended sentencing range of 10 to 16 months in zone C of the sentencing table. In light of Mr. Brogan's extraordinary family circumstances, the singular nature of his offense, and the other considerations found at 18 U.S.C. §3553(a), a sentence of probation is appropriate in this case.

**PSR objections**

Mr. Brogan objects to the guideline calculations as noted below.

He also makes the following clarifications to the PSR:

Mr. Brogan drinks alcohol perhaps ten times a year and consumes from three to six drinks on those occasions. *See* PSR ¶ 40.

Mr. Brogan pleaded guilty to resisting arrest in 1998 after being arrested during a traffic stop. Mr. Brogan acknowledges that he opened the car door into a police officer standing near the door. *See* PSR ¶ 22. Mr. Brogan did not physically assault the officer and also did not assault another officer by kicking him.

Mr. Brogan does not recall being arrested in 1997 for harassment. *See* Addendum to the PSR. He does not recall getting into a dispute with a traffic agent or fleeing from a traffic agent. Notably, harassment can be charged as a violation, not a crime. If so charged, law enforcement agents may not fingerprint the arrestee. NY CRIM. PROC. § 160.10.

Mr. Brogan does not recall being arrested in 2003 for fare beating. *See* Addendum to the PSR. He has never used the name "Donald Brogan" in any interaction with the police.

**Guideline Calculation**

The parties entered into a plea agreement which anticipated a final offense level of 10 and a corresponding sentencing range of 6 to 12 months, assuming Mr. Brogan falls within Criminal History Category I. *See* Plea Agreement ¶ 2. This sentencing range is found in Zone B of the sentencing table. Where the applicable guideline range is in Zone B, a sentence of probation with a condition of home detention satisfies the minimum term of imprisonment. USSG §5C1.1(c)(3). Mr. Brogan stipulated to this guideline calculation. *See* Plea Agreement ¶ 2. The government agreed that it would take no position concerning where within the guideline range the sentence should fall. *See* Plea Agreement ¶ 5(c).

The probation department adds 6 levels to the final offense level contained in the plea agreement. Mr. Brogan agrees that this enhancement is appropriate pursuant to USSG §3A1.2(b). However, he submits that the 4 level reduction found at USSG § 2A6.1(b)(6) also applies. Thus the final offense level should be level 12.

USSG § 2A6.1(b)(6) provides that if "subsection (a)(2) and subdivisions (1), (2), (3), (4), and (5) do not apply, and . . . the offense involved a single instance evidencing little or no deliberation" then the guideline range should be decreased by 4 levels. Neither the PSR nor the plea agreement executed by the parties applies subsections

(a)2 or (b)(1) *through* (6) of § 2A6.1 to Mr. Brogan's offense level computation.[1] Thus, since the offense involved a single threat evidencing little or no deliberation, both prongs of § 2A6.1(b)(6) are satisfied and Mr. Brogan should receive the 4 level reduction.

Mr. Brogan communicated the threat that is the basis of the instant offense after viewing a video of the victim discussing abortion rights. PSR ¶ 4. He made one single call in response to what he saw. As he recalls, he made the call almost immediately after viewing the video, leaving little or no time for deliberation. That he took no action to hide his identity when he made the call—using his own cell phone and not even attempting to block the identifying number—is further proof of his lack of deliberation. Also, the parties and probation agree that there is no evidence that Mr. Brogan intended to carry out the threat.

The Court of Appeals has noted that a threat that is the product of "a single impulse, or [is] a single thoughtless response to a particular event" warrants the 4 level reduction. *United States v. Wright-Darrisaw*, 781 F.3d 35, 41 (2d Cir. 2015)(citation omitted.) That perfectly describes the circumstances of the instant offense. Mr. Brogan's conduct was a "single thoughtless response" to the video he viewed. Because "the offense involved a single instance evidencing little or no deliberation," the 4 level reduction applies.

The correct guideline calculation is as follows:

| | |
|---|---:|
| Base Offense Level (§2A6.1(a)(1)) | 12 |
| Less: Single instance ((§2A6.1(b)(6)) | -4 |
| Plus: Official Victim (§3A1.2(b)) | +6 |
| Less: Acceptance of responsibility (§3E1.1(a)) | -2 |
| Total: | 12 |

Mr. Brogan is appropriately placed in Criminal History Category I. The advisory guideline sentencing range is 10 – 16 months in zone C of the sentencing table.

---

[1] These subsections generally provide for a lower guideline level for offenses that did not involve threats to injure and higher guideline levels for making more than two threats, threats accompanied by an intent to act, threats in violation of a court order, threats which result in substantial disruption, and public threats.

**Downward Departure**

"[F]amily ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted," however departures may be appropriate in extraordinary circumstances. *See* USSG §5H1.6. When "determining whether a departure is warranted . . . the court shall consider . . . [t]he seriousness of the offense, [t]he involvement in the offense, if any, of members of the defendant's family and [t]he danger, if any, to members of the defendant's family as a result of the offense." USSG §5H1.6, comment. (n.1(A)).

A departure based on loss of caretaking or financial support requires the presence of the following circumstances:

> (i) The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.
>
> (ii) The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.
>
> (iii) The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.
>
> (iv) The departure effectively will address the loss of caretaking or financial support.

USSG § 5H1.6, comment. (n.1(B)).

The Second Circuit has affirmed downward departures where the sentence under the Guidelines would impose extraordinary hardship upon the defendant's family, *e.g., United States v. Galante*, 111 F.3d 1029, 1036 (2d Cir. 1997), such as where a defendant is "solely responsible for the upbringing of . . . children," *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992), or where imprisonment of a defendant "might well result in the destruction of an otherwise strong family unit . . . ." *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991). Cases of downward departures for

extraordinary family responsibilities arise out of the concern that defendant's sentence should not leave the family abandoned—either materially or emotionally. The Second Circuit has explained that "we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant . . ." *Johnson*, 964 F.2d at 129.

Here, Mr. Brogan provides both essential caretaking *and* financial support to his family. Any sentence that results in his loss of employment or absence from the home will cause extraordinary hardship to his mother and brother—hardship that would certainly "substantially exceed[] the harm ordinarily incident to incarceration for a similarly situated defendant."



*Mr. Brogan (center) and his mother and brother. Christmas 2018.*

Mr. Brogan's mother and brother both require twenty-four hour supervision. Mr. Brogan provides that supervision for the twelve hours a day that home health aides are not present in the home. If Mr. Brogan were unavailable, even for as little as two weeks, the most likely outcome would be that his mother and brother would be moved to institutions, which is the norm for individuals who need twenty-four hour care and don't have family members who can act as caretakers. This would be a devastating outcome for Mr. Brogan's family members, who have lived together in the same home for more than fifty years.

The essential caretaking function Mr. Brogan provides to his mother and brother is coupled with the essential financial support he provides. Mr. Brogan lives in fear that, when his mother passes away, he will be unable to pay off the reverse mortgage his mother took out on the family home. He works very hard to make regular payments towards the debt so that the balance doesn't rise much above $300,000 in the belief that he could secure a mortgage for that amount (but perhaps not more) if necessary to pay off the reverse mortgage. Unemployment for any length of time would mean that Mr. Brogan could not make these payments, that the amount owed on the home would balloon and that he and his brother would lose the home after his mother's passing.

Mr. Brogan's family relies on him to both work full-time during the day to ensure their economic viability and to be present during non-work hours to be their caretaker. There are "no effective remedial or ameliorative programs" available which can replace Mr. Brogan's income and caretaking. Because a departure from the guideline range to a sentence of probation is the only way to effectively address the potential loss of caretaking and financial support, a downward departure pursuant to USSG § 5H1.2 is warranted.

## 18 U.S.C. § 3553(a)

A sentencing court "shall impose a sentence sufficient, but not greater than necessary" to fulfill four objectives: retribution, deterrence, incapacitation, and rehabilitation. 18 U.S.C. § 3553(a)(2); *See United States v. Booker*, 125 S.Ct. 738 (2005) (holding that the Sixth Amendment right to a jury trial was infringed by the mandatory nature of the Sentencing Guidelines, rendering the Guidelines advisory). When deciding on an appropriate sentence the Court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(2).

Mr. Brogan committed the instant offense in a moment, without any deliberation or forethought. Through counseling he has learned that the stress he often feels due to his family responsibilities may have contributed to his angry response. He is working on strategies to avoid such responses in the future and better ways to handle his stress and anxiety.

Though appalling, the threats Mr. Brogan made were idle—he had no intention, or even the means, to act on them.[2] Mr. Brogan had never before communicated threats to any person; his call to the Senator was an aberration.

To his credit, when agents came to his home a little more than a week after he made the call and questioned him, Mr. Brogan admitted what he had done and explained the circumstances. He also agreed to waive indictment and plead guilty to a criminal information. These actions indicate Mr. Brogan's sincere acceptance of responsibility.

The nature of Mr. Brogan's offense differs substantially from the two cases cited by the government in its sentencing submission of September 13, 2009. *See* Dkt. No. 21 at 6-7. The government notes that the court imposed a ten month sentence in a 2009 case in the District of Maine and that Judge Bianco imposed an eighteen month sentence in a recent Eastern District case. *Id.* Those offenses, however, each involved numerous threats made over the course of days, or even weeks.[3] One involved a defendant attempting to hide his identity by making anonymous threats. The offense conduct in both of those cases went far beyond making a single threatening call in a moment of anger.

Mr. Brogan truly regrets his criminal conduct—not just because he has placed his freedom and his family in jeopardy—but because he believes that nothing can justify making such threats and nobody deserves such treatment. He acted in a moment of anger when even a minute's reflection would have deterred him. He knows that his actions not only harmed others, but betrayed his own religious commitments. He has often said that if he ever met the victim, he would apologize and ask for forgiveness.

As noted above, an incarceratory sentence would be disastrous for Mr. Brogan's family. In a very real sense, Mr. Brogan's life revolves around his mother and

---

[2] Law enforcement agents searched Mr. Brogan's home pursuant to a search warrant and confirmed that he did not possess any firearms. They also seized and searched several electronic devices and discovered no evidence that Mr. Brogan had made prior threats.

[3] The defendant in Maine made seventeen threatening calls over four days. Judy Harrison, *Illinois Man Sentenced for Threatening Sen. Collins. Staffer*, BANGOR DAILY NEWS, (Aug. 26, 2012, 5:03 PM), https://bangordailynews.com/2010.08.26/politics/illinois-man-sentenced-for-threatening-sen-collins-staffer/. The Long Island defendant left twelve anonymous, threatening messages in September and October of 2018. Press Release, Long Island Man Sentenced to 18 Months Imprisonment for Threatening to Assault and Murder Two United States Senators, (June 3, 2019), https://www.justice.gov/usao-edny/pr/long-island-man-sentenced-18-months-imprisonment-threatening -assault-and-murder-two.

brother, his neighbors, and his church.[4] He is rarely away from home except when he's at work. He is usually preoccupied with his family's medical needs; arranging for and shuttling them to appointments with health care providers. He also takes pains to make sure that his brother gets outside the house for socialization. . He attends Mass regularly at two parishes and makes sure to check in on his neighbors and assist them wherever he can.

Mr. Brogan has worked steadily as an IT professional since earning his Microsoft Certificate in 2000. Though much of this work was through a consulting/temporary agency, he now has permanent employment and works full time for New York Presbyterian Hospital where he earns about $43,000 annually. He spends almost the entirety of his salary on household expenses.

Mr. Brogan was arrested for the instant offense on December 12, 2018 and released the same day on a bond with a condition of electronically monitored home detention. That condition was changed to a curfew on May 24, 2019. It is true that Mr. Brogan found home detention difficult and frustrating in the beginning. *See* PSR ¶¶ 2, 39. His frustration arose mostly because when he was first put on home detention, he failed to plan his day so that he could purchase household necessities. When he got home from work and realized that his brother or mother needed an item that wasn't in the house, he had no way to obtain it. He acknowledges venting his frustration with his pretrial officer but he always called back soon after to apologize for his words. Mr. Brogan's frustrations ebbed as he began to take more care to ensure that he took care of household needs in the time provided by pretrial. Mr. Brogan has never intentionally violated the conditions of his release, though he may have returned home later than expected while still on home detention because of train problems.

Mr. Brogan commission of this crime occurred during a momentary lapse of reason and decorum by a man under great stress because of his family responsibilities. He is truly remorseful for his conduct and attends counseling to ensure nothing like this ever happens again. Mr. Brogan's family circumstances, where he is both an essential caretaker and important financial support for his mother and brother, are such that a sentence that includes prison time would be catastrophic. A sentence of probation, with appropriate conditions to serve the interests of justice, is therefore warranted in this case.

---

[4] Attached as Exhibit A are letters from priests from two Brooklyn parishes attesting to Mr. religious devotion and a letter from his long-time neighbor affirming Mr. Brogan's family circumstances and describing his assistance to her and her family.

Thank you for your attention to this matter.

                                              Respectfully submitted,

                                                            /s/

                                            Michael K. Schneider, Esq.
                                            (718) 330-1161

cc:    Clerk of the Court (by ECF)
        Mr. Philip A. Selden, Assistant U.S. Attorney (by ECF and email)
        Ms. Patricia A. Sullivan, United States Probation Officer (by email)
        Mr. Michael Brogan (by email)